UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: PLATINUM PROPERTIES, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 11-05140-BHL-11 |
| | ) | |
| In re: PPV, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 11-05141-FJO-11 |

**DECLARATION OF STEVEN R. EDWARDS
IN SUPPORT OF FIRST-DAY PLEADINGS**

I, Steven R. Edwards, declare under penalty of perjury as follows:

1. I am the Chief Financial Officer of Platinum Properties, LLC ("Platinum") and, indirectly, of PPV, LLC ("PPV"; and together with Platinum, the "Debtors"). I have served in the position of Chief Financial Officer for Platinum since it was formed in 1997, and for PPV since it was formed in 2003.

2. In this role, I have become familiar with the Debtors' day to day operations, business and financial affairs.

3. I submit this declaration (the "Declaration") in support of the Debtors' petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code") filed on April 25, 2011 (the "Petition Date"), and the relief set forth in the motions and applications filed by the Debtors concurrently herewith (the "First-Day Pleadings").[1]

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day or Emergency Pleading. I also submit this Declaration to assist this Court and any interested parties in understanding the circumstances that compelled the petition for relief in the above-captioned case.

BDDB01 6638250v3

## I. Background

4.  Platinum is a residential real estate developer. It is in the business of manufacturing and selling residential real estate lots. It acquires land, designs the project, obtains zoning and other approvals, constructs roads, drainage, utilities, and other infrastructure of residential subdivisions, then sells the finished, platted lots.

5.  PPV is essentially a joint venture between Platinum and a non-debtor entity, Pittman Partners, Inc., each of whom hold an equity interest in PPV. PPV owned four projects directly, and owns 100% of the membership interest of Sweet Charity Estates, LLC, which developed a project known as "Westmont". Only one of PPV's four projects, Long Ridge Estates, is currently active, as the other three projects are now sold out. Platinum has a 65% interest in the proceeds of lot sales out of Long Ridge Estates, after all of Platinum's equity investment in the project has been returned. PPV has no employees. All development and management services are provided by Platinum.

6.  Platinum currently owns and is developing and marketing five projects: Abney Glen, Bellewood, Countryside, Maple Knoll (excluding sections 4A and 4B), and Mount Vernon Trails. In addition, similar to its relationship with PPV, Platinum has an ownership interest in several special purpose entities ("SPEs") that in turn own, operate and manage individual projects. The SPEs include the following:

| Entity | Real Estate Project Owned | Members | Manager |
|---|---|---|---|
| Eagles Nest Land Developer, LLC | Eagles Nest | Platinum – 100% | Platinum |
| Fishers East, LLC | Fishers East | Platinum – 100% | Platinum |
| East Carmel, LLC | Legacy | Platinum – 100% | Platinum |
| Maple Knoll, LLC | Maple Knoll sections 4A and 4B | Platinum – 100% | Platinum |

-2-

| Reserve at Steeplechase, LLC | Reserve at Steeplechase | Platinum – 100% | Platinum |
|---|---|---|---|
| Sweet Charity Estates, LLC | Westmont | PPV – 100% | Platinum |
| West Avon, LLC | Western Hills | Platinum – 100% | Platinum |
| Wynne Farms, LLC | Wynne Farms | Platinum – 80%<br>4 Other Investors – 20% | Platinum |

7.  In addition, three projects were transferred from Platinum to SPEs with the same ownership structure as Platinum as part of a structured settlement to resolve litigation involving those projects. Those projects are Sanctuary at 121st Street, Sanctuary at 116th Street and Ridge at Hayden Run (the "Shoopman Projects"). Although the SPEs assumed the obligations on the debt related to those projects, Platinum was not released and essentially serves as a guarantor with respect to the debt associated with those projects.

8.  Each of the Platinum, PPV and SPE projects has a senior loan. Some of the projects have junior or subordinated loans. Platinum, as direct borrower or guarantor, is obligated on the senior loans of all of the projects. As of December 31, 2010, the senior loan principal outstanding for which Platinum has direct or guarantor liability was roughly $106,000,000. Part of this $106,000,000 includes senior loans made directly to PPV, or that were guaranteed by PPV. As of December 31, 2010, the senior loan principal outstanding owed directly by PPV or by virtue of a PPV guaranty is roughly $16,000,000.

9.  The Debtors are victims of the well publicized collapse of the residential housing market that began in early 2006. The Indianapolis area housing permits issued during this period of time dropped from 13,000+ in 2005, to less than 4,000 in each of 2009 and 2010. Although the Debtors actually increased their market share of lots sold during this period, total lots sold by the Debtors also plummeted from a high of 751 lots in 2006, to a low of 183 lots in

BDDB01 6638250v3

2009. The Debtors sold 266 lots in 2010. This deterioration of top line revenue has severely challenged the Debtors' ability to sustain its operations.

10. Most of the lenders on projects of the Debtors or their related SPEs have been cooperative and patient, having entered into formal or informal forbearance agreements, or other loan extension agreements, with the Debtors or their related SPEs. There have been exceptions, which are described in the paragraphs that follow.

11. The Shoopman Projects all fell into default in 2009 primarily as a result of certain homebuilding companies owned by Paul Shoopman (collectively, "Shoopman Homes"), who had entered into lot take down agreements in connection with the Shoopman Projects, not purchasing lots pursuant to the lot takedown agreement commitments. This caused the lender on the Shoopman Projects, RBS Citizens, National Association ("RBS") to initiate a foreclosure action. Platinum, as part of that foreclosure action, asserted crossclaims and third party claims against Shoopman Homes and Paul Shoopman (who is also the subordinated lender on the Sanctuary at 116th Street project) for their alleged breaches, seeking a declaration that builder deposits had been forfeited. Shoopman Homes and Paul Shoopman, in turn, filed claims against RBS, Platinum, and a title company alleging a host of purported breaches by those parties. The parties agreed to participate in mediation which commenced in June 2010, and in August 2010, a settlement was reached. Documenting that settlement proved to be extraordinarily complicated, and the documentation process extended over seven months. When closed, the settlement results in a reduction of Platinum liabilities in excess of $12.6 million, assuming future performance of the parties. This litigation was not a contributing cause to the filing of the Debtors' bankruptcy case.

12. Bank of America ("BOA") is a lender to three projects: Long Ridge Estates (owned by PPV), Maple Knoll (owned by Platinum), and Legacy (owned by East Carmel, LLC, a Platinum SPE). The Debtors and BOA entered into forbearance agreements with respect to Long Ridge Estates and Maple Knoll. BOA would not enter into a forbearance agreement with respect to its loan at Legacy, and instead initiated a foreclosure action late in 2010. BOA filed a motion for summary judgment and the defendants (which include Platinum) have sought discovery in connection with the filing of a response. Debtors were recently advised that BOA sold its Legacy loan to Star Financial Bank. This litigation has not been a contributing factor to the filing of the Debtors' bankruptcy cases.

13. PNC Bank, N.A. ("PNC") is the lender on three projects with loans that matured in late 2009 as follows: Heather Knoll (owned by PPV), Westmont (owned by Sweet Charity Estates, LLC, which in turn is 100% owned by PPV), and Reserve at Steeplechase (owned by Reserve at Steeplechase, LLC, which is 100% owed by Platinum). PNC was not a patient lender, and filed foreclosure suits in Hamilton County on each of the three projects. PPV sold out all of the lots at Heather Knoll and paid off PNC in full with respect to that credit before the PNC foreclosure action for that project went to judgment. On January 27, 2011, the Hamilton County court issued judgments in favor of PNC and against the Westmont project in the approximate amount of $10,000,000, and against the Reserve at Steeplechase project in the approximate amount of $6,000,000. The judgments were against the SPE owners of those two projects, and as well PPV, as guarantor with respect to Westmont, and Platinum, as guarantor with respect to both Westmont and Reserve at Steeplechase. Since obtaining those judgments against the Debtors, the Debtors have been required to obtain partial judgment releases from PNC in order to sell lots in the projects owned by the Debtors. PNC has used its position as

judgment holder to delay closings, and in one circumstance, to extract a payment of $34,000 from a closing, forcing the Debtors' to obtain increased loan financing, which increased loan financing will further impair the Debtors' cash flow later this year. The PNC judgments, and the use by PNC of its judgment lien to impair, delay, or increase the cost of lot closings, is the primary contributing factor to the filing of the Debtors' bankruptcy cases.

## II. First-Day and Emergency Pleadings

14. Contemporaneously with the filing of its Chapter 11 petitions, the Debtors have filed the First-Day and Emergency Pleadings seeking entry of a number of orders (the "First-Day Orders") that the Debtors believe are necessary to enable it to operate in Chapter 11. A description of the First-Day and Emergency Pleadings is provided below.

### First Day Motion For Joint Administration

15. Platinum and PPV have sought entry of an order for the joint administration of the two cases.

16. PPV is an ownership vehicle for projects developed under its joint venture with Pittman Partners, Inc. PPV does not have any employees. All of the administrative functions which permit PPV to operate its business are discharged by Platinum. Pittman Partners, Inc. is not involved with PPV's operations, and does not have any management responsibilities to PPV.

17. Adequate protection or other matters affecting a project will be custom to that project, no matter who (as between PPV or Platinum) is the owner. Otherwise, cash management, financial reporting and budgeting, payment and management of employees and all other aspects relating to the administration of the cases will be most efficiently discharged by joint administration.

BDDB01 6638250v3

18. Filing duplicate motions and requests for relief for matters that will generally affect each estate equally would be unduly burdensome and create unnecessary expense.

19. I believe that the joint administration of the Platinum and PPV cases to be in the best interest of each of these Debtors and their respective estates.

### First-Day Motion For Order Authorizing (A) Maintenance Of Existing Bank Accounts, (B) Continued Use of Existing Business Forms, and (C) Continued Use of Existing Cash Management System

20. Prior to the Petition Date and in the ordinary course of business, the Debtors maintained five bank accounts at the following institutions: Key Bank, Indiana Bank & Trust, and Bank of America, N.A. (the "Bank Accounts"). In addition, the Debtors used certain correspondence and business forms, including, but not limited to, invoices, checks, vendor communications and documents, letterhead, envelopes and other business forms (collectively, the "Business Forms").

21. The existing cash management process of the Debtors allows the Debtors to separately maintain and identify revenues associated with each project, and manage each project by payment of project expenses from the revenue that the project generates. It is important to each of the lenders to projects operated by the Debtors that the sources and uses of funds for each project be maintained separately, and not commingled.

22. It would be burdensome for the Debtors to close each of its accounts and reopen new ones while maintaining the project integrity of the Debtors' accounting as required by each of the Debtors' lenders.

23. I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession. The Debtors can work with the United

States Trustee to provide a clear line of demarcation between pre-petition and post-petition claims and payments out of the Bank Accounts as an alternative to closing the Bank Accounts and opening new ones.

24. I believe that it is in the best interest of the Debtors that the Debtors continue to use current Bank Accounts and Business Forms as proposed in the cash management motion.

## Emergency Motion To Permit The Sale Of Lots In The Ordinary Course Of Business Free And Clear Of Liens, With Liens To Attach To Sales Proceeds

25. The Debtors are in the business of selling residential real estate lots. In order to sell a lot, the Debtors have to be able to convey to a buyer good and insurable title. Traditionally, title companies require partial releases of mortgage (or other liens, such as judgment liens) as a condition to insuring over them.

26. The key circumstance that precipitated the filing by the Debtors of their bankruptcy cases was the Debtors' inability to reach a settlement with PNC that would result in the release of PNC judgment liens against the Debtors. Absent the release of PNC judgment liens against the Debtors, PNC has the ability to substantially paralyze the Debtors' continued operations if PNC chooses at any future time to not provide partial releases of its judgments when the Debtors sell lots in the future at any of the Debtors' projects. None of the Debtors' current projects have been financed by PNC. If PNC chooses to not release its judgment liens at any future time, such action will severely impair the economic interests of the lenders who did provide loans to the Debtors for the Debtors' projects because the Debtors will not be able to sell lots in the ordinary course of business.

-8-

BDDB01 6638250v3

27. The Debtors have, contemporaneously with the filing of their bankruptcy cases, commenced an adversary proceeding against PNC to avoid the PNC judgment liens under Section 547 of the Bankruptcy Code, preserve the avoided judgment liens for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code, and recover from PNC the $34,000 pre-petition payment demanded by and paid to PNC as a condition to PNC's issuance of a partial release of its judgments, pursuant to Section 550 of the Bankruptcy Code.

28. Any delay that the Debtors sustain in connection with closing a sale of a lot is an obvious impairment to their cash flow. The Debtors' cash flow could be further impaired by a market perception that the Debtors are not only delayed, but perhaps unable, to convey good title to sold lots. It is absolutely imperative to the Debtors' survival that the Debtors are able to sell lots in the ordinary course of business without creating any extra work or aggravation to the lot purchaser. Otherwise, in the existing challenged real estate economy and highly competitive market for the sale of lots, potential lot purchasers could choose to purchase lots from other developers at other communities.

29. The judgment liens asserted by PNC are clearly avoidable as a preference. PNC is not entitled to any adequate protection, nor should it be permitted to prevent, delay or impair lot sales by the Debtors.

30. The Debtors intend to negotiate adequate protection arrangements with their lenders that substantially mirror the forbearance agreements or other loan extension agreements under which the Debtors and their lenders operated pre-petition. Under the motion to authorize sale of lots in the ordinary course, liens of the Debtors' lenders will attach to proceeds of the sales.

BDDB01 6638250v3

31. I believe that it is in the best interests of the Debtors and their estates that the Debtors are permitted to sell lots in the ordinary course of business free and clear of liens, with liens to attach to the proceeds of sale.

**First Day Motion For Authority to Use Cash Collateral**

32. The project lenders have a lien on lots and the proceeds of lot sales.

33. It is critical that the Debtors be allowed to use cash generated by the lot sales so as to maximize the value of the estates and pay their creditors. The immediate use of cash collateral is necessary to pay the necessary and reasonable expenses of operating their businesses, including, without limitation, payroll expenses, utility services, payroll taxes, insurance, supplies and equipment, vendor and supplier services, and other expenditures as are necessary for operating the Debtors' businesses

34. Prior to the Petition Date, the Debtors were permitted under its forbearance or other loan agreements with project lenders to use a portion of lot sale proceeds for operating expenses. The Debtors propose to use the same percentage on amounts permitted prior to the filing date, and escrow the remaining proceeds pending the negotiation of more comprehensive adequate protection agreements with project lenders, or further order of the Court.

35. Without the ability to immediately use cash collateral, the Debtors will be unable to continue to operate and the estates of the Debtors will be irreparably harmed.

36. I believe that the proposed authority to use cash collateral is in the best interests of the Debtors and their respective creditors.

*Remainder of page intentionally left blank*

BDDB01 6638250v3

Signature Page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of APRIL, 2011 at INDIANAPOLIS, Indiana.

                                                                                   _____
                                                                                   Steven R. Edwards, Chief Financial Officer